# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

|  |  |  |
|---|---|---|
| Joseph Murphy, | ) | |
| Plaintiff | ) | No. 1:22-cv-1266 |
| v. | ) | Judge Jonathan E. Hawley |
| Curtis Bailey, *et al.* | ) | |
| Defendants. | ) | |

## DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES[1]

Defendants hereby move this Court to enter summary judgment in their favor under Rule of Civil Procedure 56, and in support they state:

## I. INTRODUCTION

The undisputed facts demonstrate that Plaintiff Joseph Murphy failed to properly exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA) before filing this lawsuit. The grievance process at Pontiac Correctional Center was readily available to Plaintiff, as evidenced by her frequent and successful use of the process before and after the alleged incidents. Despite this, Plaintiff failed to exhaust her administrative remedies for the July 19, July 23, and July 27, 2022 allegations before going to court. Plaintiff's own actions contradict her

---

[1] This is Defendants' renewed motion for summary judgment pursuant to this Court's order of March 14, 2025. Twenty-nine exhibits have already been filed in Defendants' original motion and remain of record. In the interest of judicial efficiency and to avoid duplicating filings or unnecessarily inflating the docket, Defendants incorporate by reference all such exhibits (1 through 29), previously filed at ECF No. 73-1, *et seq.*

assertion of unavailability of administrative remedies. Moreover, Plaintiff's contention that subjective beliefs prevented her from using the grievance system is not an excuse under the PLRA and is inconsistent with her demonstrated ability to file numerous grievances during that time.

## II. UNDISPUTED MATERIAL FACTS

1. Plaintiff is Joseph Murphy, IDOC number M42534. (Exhibit 1, Pl.'s Resp. to Defs.' Requests to Admit ¶ 1).

2. On June 8, 2022, Plaintiff transferred from Dixon Correctional Center to Pontiac Correctional Center. (Ex. 1 ¶ 43);[2] (Exhibit 2, Pl.'s Movement History, IDOC 000803.)

3. On June 9, 2022, Plaintiff attended inmate orientation at Pontiac Correctional Center. (Ex. 1 ¶ 44); (Exhibit 3, CHAMPS, June 9, IDOC 000775); (Exhibit 4, Decl. of Anthony Leslie ¶ 6.)

4. On or about June 9, 2022, Plaintiff received a copy of the Pontiac Orientation Manual. (Ex. 1 ¶ 45); (Ex. 4 ¶ 6); (Exhibit 5, Pontiac Orientation Manual, IDOC 000581-000760).

---

[2] For each document in which authenticity was requested to be admitted, or when Plaintiff's own actions were requested to be admitted, Plaintiff responded without unequivocal denials. Plaintiff's responses do not comply with Rule of Civil Procedure 36(a)(4). The rule requires that when a party lacks knowledge to admit or deny, they must state that they have made reasonable inquiry and that the information they know or can readily obtain is insufficient to enable them to admit or deny. Further, a denial must "fairly respond to the substance of the matter." Plaintiff's bare assertions of lack of information, without stating that she made a reasonable inquiry—particularly for documents that were authored by the Plaintiff herself, or things Plaintiff personally experienced—fails to meet this standard of what constitutes a "written answer or objection." Consequently, pursuant to Rule 36(a)(3), the requests should be deemed admitted as Plaintiff has not provided unequivocal responses within the meaning of the rule.

5.    The Pontiac Orientation Manual Plaintiff received on June 9, 2022, contained information on the filing of grievances at Pontiac Correctional Center and the IDOC grievance procedure. (Ex. 5 at 30-31 and 147-149.)

6.    A grievance procedure is available for all individuals in custody at Pontiac Correctional Center. (Ex. 4, Decl. of Leslie ¶¶ 5, 7-10); (Ex. 5 at 30-31, IDOC 000581-000760); (Exhibit 6, Decl. of Attig ¶¶ 6-7); (Exhibit 7, Decl. of Bailey ¶ 6.)

7.    The first step of the grievance process is for an individual in custody to fill out a grievance form and to deposit the form in one of the many available grievance boxes at Pontiac. (Ex. 4 ¶ 7); (Ex. 6 ¶¶ 6-8); (Ex. 7 ¶ 6); (Exhibit 8, Decl. of Bantista ¶ 11;) (Exhibit 9, Decl. of Williams ¶ 18); (Exhibit 10, Decl. of Dayton ¶¶ 5, 8).

8.    Although grievances must be filed within 60 days of the event or occurrence being complained of, if a person is unable to file a grievance because of a crisis watch, the 60-day deadline is not applicable due to mitigating circumstances, and grievances related to allegations of sexual abuse are not subject to any filing time limit. (Ex. 4 ¶ 17); (Ex. 7 ¶ 13); (Ex. 10 ¶ 10); 20 Ill. Adm. Code 504.810(a).

9.    Grievances that are dropped in the red Grievance Only box ("the Red Boxes") are reviewed. (Ex. 4 ¶ 8); (Ex. 7 ¶¶ 7-10).

10.    All Housing-Unit Clinical Counselors tour their cell houses weekly and pick up grievances from the Red Boxes. (Ex. 4 ¶ 9); (Ex. 7 ¶¶ 7-10).

11.    Once grievances are picked up from the Red Boxes, they are brought to the grievance office for processing. (Ex. 4 ¶ 10); (Ex. 7, Decl. of Bailey ¶¶ 7-10).

12.    If the grievance pertains to excessive force of sexual abuse or assault (colloquially referred to as "PREA"), then the grievance is automatically processed at the second level for review, and the grievance is also forwarded to Internal Affairs and the PREA compliance manager for review. (Ex. 4 ¶¶ 13-14.)

13.    All issues are investigated and evaluated. Once all information is gathered, the decision is determined whether the individual's allegations are substantiated or unsubstantiated. (Ex. 4 ¶ 15.)

14.    In no circumstances are grievances discarded unless written correspondence is sent to the grievance office and the individual requests that their specific grievance be withdrawn. (Ex. 4 ¶ 19.)

15.    All incarcerated individuals, regardless of their status (restrictive housing, mental health units, etc.) are granted the same rights to the grievance process. (Ex. 4 ¶ 18, 20); (Ex. 7 ¶ 12); (Ex. 9 ¶¶ 21, 25); (Ex. 10 ¶¶ 12, 15.)

16.    Grievance boxes are throughout Pontiac Correctional Center. All cages have a portable grievance box to take around to individuals while on lockdown status. (Ex. 4 ¶ 21.)

17.    In South Protective Custody, a Red Box is located right inside the cell house door on the first floor. (Ex. 4 ¶ 21.)

18.    At Pontiac's South Mental Health Housing, there are grievance boxes on each floor. The first-floor box is located between Gallery 1 and Gallery 2, and on the second floor it is located between Gallery 3 and Gallery 4. (Ex. 4 ¶ 22.)

19.    In Pontiac's North Restrictive Housing, the grievance boxes are located on the "flag area" of each gallery. (Ex. 4 ¶ 23); (Ex. 9 ¶ 20.)

20.    Each cell house has two different grievance boxes. A Red Box, and a Grey Box. (Ex. 4 ¶ 25); (Ex. 7 ¶ 7.)

21.    The Red Box has a handle and wheels. The top of the box has a drop slot to deposit grievances. Each box has a door on it with a lock and a Unit Counselor can open them. (Ex. 4 ¶ 26); (Ex. 7 ¶ 7.)

22.    The Grey Box has similar features to the Red Box, but the Grey Box is used during lockdowns. (Ex. 4 ¶ 27); (Ex. 7 ¶ 7.)

23.    The only way to physically access the contents of either box is by key. Otherwise, there is no physical way to access the grievances inside the boxes. (Ex. 4 ¶ 28); (Ex. 6 ¶¶ 9-11); (Ex. 7 ¶ 8.)

24.    Only clinical staff members and clinical supervisors have access to the keys that unlock grievance boxes. (Ex. 4 ¶ 29); (Ex. 6 ¶¶ 9-11); (Ex. 9 ¶ 26.)

25.    Each drop box is designed and located in the cell houses for individuals to be able to place the grievances in the boxes themselves, so no staff member is handling the grievance prior to dropping any grievance in a box. (Ex. 4 ¶ 30); (Ex. 6 ¶ 11.)

26.     Plaintiff's status and location of confinement at Pontiac between July 2022 and September 2022 would have no effect on her access to filing a grievance and the IDOC's review of any grievance filed during that time. (Ex. 4 ¶ 31.)

27.     Daily during the 3pm to 11pm shift, the Grievance Boxes are brought around the galleries, and individuals in custody place their grievances in the box themselves (not the staff member). (Ex. 4, Decl. of Leslie ¶ 32); (Ex. 7 ¶ 7.)

28.     If, during the time the grievance box is being brought around the galleries, an individual wanting to file a grievance is in restrictive housing, the cuffing hatch of the cell is then opened and the individual places the grievance in the box themselves. If the facility is on a lockdown, there is a smaller handheld box in every control cage for every cell house that is brought around to all cells, and the individuals place their grievances in those boxes. (Ex. 4 ¶ 32.)

29.     If an individual in custody does not feel they can trust cell house staff to file their grievance due to retaliation threats, the individual in custody can: (1) Submit the grievance to their cell house counselor, during the counselor's weekly tours; (2) write to the grievance office and request that they pick up the grievance due to the incarcerated person's lack of trust in other staff members; (3) drop the grievances in a fixed (non-mobile) grievance box, which every inmate passes anytime they come out of their cell; (4) or ask mental health staff to assist them with filing the grievance for them. (Ex. 4 ¶ 33); (Ex. 6 ¶¶ 19-21); (Ex. 7 ¶¶ 14-15); (Ex. 9 ¶ 24.)

30.     Individuals in the Mental Health Units are granted the same rights to the grievance process as other persons in custody. (Ex. 4 ¶ 18, 20); (Ex. 7 ¶ 12); (Ex. 9 ¶¶ 21, 25); (Ex. 10 ¶¶ 12, 15.)

31.     Every cell house has a grievance box at the end of each wing or at the front door of the cell house that the individuals may take their grievances with them and drop them in the boxes themselves when they walk by them. (Ex. 4 ¶ 33.)

32.     Individuals in custody can ask any IDOC employee, no matter if they are security or another department, for a grievance form. Individuals may also write the grievance office for a blank grievance form, or their cell house counselor and one will be forwarded to the individual via institutional mail. They may also ask their cell house counselor when they do their scheduled weekly tours, and one will be provided at that time. (Ex. 4 ¶ 35); (Ex. 6 ¶ 17); (Ex. 9 ¶ 29).

33.     A verbal grievance is not an official complaint for the grievance process. The individual may make a verbal grievance to mental health, medical, or counselors and they would try to remedy the issue to the best of their ability; however, the individual would not be complying with the grievance process. (Ex. 4 ¶ 38); (Ex. 6 ¶ 19); (Ex. 10 ¶ 9.)

### **Plaintiff's Contention of Unavailability of Grievance Process**

34.     Plaintiff contends that at no time between June 2022 to October 2022 was the grievance process available to her, other than September 2, 2022, when Plaintiff submitted a grievance about the July 19 and July 27 Allegations. (Exhibit 11, Pl.'s Ans. to Interrogs. ¶ 3-4.)

35.    Plaintiff contends that "Pontiac staff and correctional officers would not accept her grievances." (*Id.*)

36.    Plaintiff contends that "Correctional Officer Williams, who was in charge of bringing Plaintiff's food and accompanied her any time she left her cell, said 'Back in the day we used to do stuff to people's food like put glass and razors in their food' " and would "make threats by mimicking the moans and sounds of someone being beaten" to Plaintiff. (*Id.*)

37.    Plaintiff contends that "Pontiac staff and correctional officers" would not accept grievances from Plaintiff when the secured and locked grievance boxes were wheeled through the halls. (*Id.*)

38.    Plaintiff contends "the locked grievance box was never available to Plaintiff because correctional officers circulating the box did not allow her to place her grievances in the box." (*Id.*)

39.    Plaintiff contends that she was "not able to use alternative drop-off locations for grievances, because she was accompanied by a correctional officer at all times, and was afraid of what they might do to her if they confiscated a grievance." (*Id.*)

40.    Plaintiff contends that she was "uncomfortable" using "unsecured grievance boxes, because they were unlocked and she was afraid that Correctional officers would read her grievance and inflict violence upon her." (*Id.*)

41.     Plaintiff contends that an unnamed correctional officer, Correctional Major Bantista, and Correctional Officer Williams "[a]ll refused to provide Plaintiff with grievance forms or receive grievance forms from plaintiff." (*Id.* ¶ 5.)

42.     Plaintiff contends that Defendant Curtis Bailey "was present in the proximity of Plaintiff following" the July 27 Alleged assault, and "refused to provide Plaintiff with access to grievance procedures, as well as by threatening and intimidating her" and "[h]e retaliated against Plaintiff by submitting a false and manufactured ticket against her." (*Id.* ¶ 4.)

43.     Plaintiff contends that "Defendant Dayton was also around Plaintiff multiple times after the assaults," and that "[h]e refused to provide Plaintiff with access to a grievance form and a locked grievance box, and retaliated against Plaintiff by submitting manufactured and false tickets against her." (*Id.*)

44.     Plaintiff contends that after July 27, 2022, "Staff at Pontiac continued to refuse to provide Plaintiff with a grievance form, or accept grievances." (*Id.*)

**Plaintiff's Numerous Grievances and Failure to Follow Proper Procedure as to July 19, 23, and 27 Allegations**

45.     On June 10, 2022, while in custody at Pontiac Correctional Center, Plaintiff properly filed a grievance directly with the Administrative Review Board about an incident on June 8, 2022 (when Plaintiff was at Dixon Correctional Center) alleging that the tactical team was "punching and stomping down on" Plaintiff's head. (Exhibit 12, June 10 Grievance, IDOC 000353-000358.) On August 5, the Administrative Review Board responded to that grievance finding it unsubstantiated. (*Id.* at IDOC 000353.)

46.     On June 11, 2022, while in custody at Pontiac Correctional Center, Plaintiff properly filed a grievance directly with the Administrative Review Board about an incident on June 7, 2022 (when Plaintiff was at Dixon Correctional Center) alleging that Scott A. Nailor sexually harassed Plaintiff in her cell. (Exhibit 13, June 11 Grievance, IDOC 000330-000336.) The ARB remanded it to Dixon Correctional Center for investigation, and upon conclusion of that investigation, the ARB responded finding that the allegation was unsubstantiated. (*Id.* at IDOC 0000330.)

47.     On June 24, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center's Grievance Office regarding "C/O Jackson" coming to Plaintiff's cell door "upset because [Plaintiff] wouldn't keep secrets about sexual comment[s] he made against/to [Plaintiff]," and that Plaintiff "made a PREA claim against C/O Jac[k]son only 10 min prior to him coming to [her] door." (Exhibit 14, June 24 Grievance #1, IDOC 000041-000042.) On August 24, 2022, a clinical counselor responded to Plaintiff's June 24 grievance. (*Id.* at 000041.)

48.     On June 24, 2022, Plaintiff filed an emergency grievance with the Pontiac Correctional Center Grievance Office about Correctional Officer Young, "along with other Tact Team Staff" "excessively restrain[ing]" Plaintiff in a chair to be taken to a shower. (Exhibit 15, June 24 Grievance #2, IDOC 000053-000054.) On July 1, 2022, the warden's office determined the grievance was not an emergency and returned it to Plaintiff. (*Id*. at IDOC 000053.) On August 11, 2022, a clinical counselor also responded to the grievance. (*Id*.)

49.     On July 13, 2022, Plaintiff signed a Motion and Affidavit to Proceed in District Court without Prepaying Fees or Costs, which she filed in this case on August 11, 2022. (ECF No. 3, at 2.)

50.     Plaintiff alleges that on July 19, 2022 ("July 19 Allegations"), Defendants Dayton, Peters, Brown, and others engaged in excessive force, refused to request medical attention for Plaintiff, and "failed to intervene" in alleged deprivation of constitutional rights. (ECF No. 61 ¶¶ 16-22.)

51.     On July 22, 2022, Plaintiff filed a grievance directly with the Administrative Review Board alleging that on June 29, July 5, and July 19, 2022, Plaintiff had requested medical attention but that no medical attention was forthcoming. As to the July 19 date, Plaintiff only stated that "I requested medical by MHP Carman on 07-19-2022 in Holding Tank 120. She along with multiple Mental Health Staff has made Incident Reports & Relayed to [their] Supervisor my need of medical attention."). (Ex. 1 ¶ 53); (Exhibit 16, July 22 Grievance #1, IDOC 000360-000361.) On July 27, 2022, the Administrative Review Board rejected the July 22 Grievance, returning it to Plaintiff and requesting additional information in the form of the counselor's response, grievance officer's response, and chief administrative officer's response. (*Id.* at IDOC 000359.)

52.     Again, on July 22, 2022, Plaintiff filed a grievance directly with the Administrative Review Board alleging the July 19 Allegations. (Ex. 1 ¶ 54); (Exhibit 17, July 22 Grievance #2, IDOC 000362-000364.) On July 27, 2022, the Administrative Review Board returned the July 22 Grievance about the July 19

Allegations, sending it back to Plaintiff and requesting additional information in the form of the counselor's response, grievance officer's response, and chief administrative officer's response. (*Id.* at IDOC 000362.)

53.     Plaintiff alleges that on July 23, 2022, Defendant Anderson sexually abused Plaintiff by "grabb[ing] and squeez[ing] Plaintiff's breast in an attempt to please himself sexually." (ECF No. 61 ¶¶ 23-27) ("July 23 Allegations").

54.     Plaintiff never filed a grievance relating to any events occurring on July 23, including the July 23 Allegations. (Ex. 1 ¶ 55.)

55.     Plaintiff contends that on July 27, 2022, Defendant Bailey sexually assaulted Plaintiff and that Defendant Attig failed to intervene in such assault. (ECF No. 61 ¶¶ 28-39,) ("July 27 Allegations").

56.     On August 2, 2022, Plaintiff requested and received a copy of her trust fund account at Pontiac Correctional Center from her clinical counselor. (Ex. 1 ¶ 63); (Ex. 3, CHAMPS, Aug. 2, IDOC 000773).

57.     On August 4, 2022, Plaintiff filed a grievance relating to the July 27 Allegations directly with the Administrative Review Board. (Ex. 1 ¶ 64); (Exhibit 18, Aug. 4 Grievance, IDOC 000350-000352). On August 18, 2022, (seven days after Plaintiff's complaint was filed) the Administrative Review Board rejected the August 4 Grievance about the July 27 Allegations, returning it to Plaintiff and requesting additional information in the form of the counselor's response, grievance officer's response, and chief administrative officer's response. (*Id.* at IDOC 000350.)

58.     On August 9, 2022, Plaintiff signed a copy of the original complaint filed in this case. (Ex. 1 ¶ 68); (Complaint at 15, ECF No. 1.)

59.     Also on August 9, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center Grievance Office alleging that staff (a "Srg. Shield") was discriminating against Plaintiff because of religious beliefs, and Plaintiff was being denied a hijab, rug, prayer beads, and pouch covering to practice Islam. (Ex. 1 ¶ 69); (Exhibit 19, Aug. 9 Grievance, IDOC 000017-000018, 000043-000044, 000021). The Grievance Office responded to this grievance twice. (*Id.* at IDOC 000017-18, 21.)

60.     On August 10, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center Grievance Office alleging that Plaintiff was not receiving correct medication, and that Plaintiff was being neglected by medical and mental health staff. (Ex. 1 ¶ 70); (Exhibit 20, Aug. 10 Grievance, IDOC 000039-000040.) The Grievance Office responded to this grievance. (*Id.* at IDOC 000039.)

61.     On August 11, 2024, Plaintiff filed the initial complaint in this action, along with a copy of the trust fund account Plaintiff received on or about August 2 and affidavit of indigency signed July 13. (ECF Nos. 1, 3-4.)

62.     On August 19, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center's Grievance Office alleging that a John Doe correctional officer had requested sex from Plaintiff, and that when Plaintiff refused, the officer did not provide a lunch tray. Plaintiff alleged in this grievance the July 27 Allegations, including that "Srg. Bailey for raping me" and the Officer "saying that Srg. Bailey

should have <u>fucked me in my ass</u>." (Ex. 1 ¶ 71); (Ex. 21, Aug. 19 Grievance, IDOC 000033, 000035-000036) (emphasis added). The Grievance Office responded to this grievance. (*Id.* at IDOC 000033.)

63.     Regarding the August 19 Grievance, a Clinical Counselor I wrote an incident report about the allegation from Plaintiff that an "unknown officer while passing out lunch trays asked this [Individual in Custody] to suck his penis or he won't get a lunch tray." (Exhibit 22, Report of Aug. 23, 2022, IDOC 000037.)

64.     On August 20, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center's Grievance Office alleging that Plaintiff had suffered hearing loss because of a warning shot being fired from a tower, and that "Still I've been neglected I believe as retaliation for my reporting one of <u>Pontiac's staff for raping me</u> because as of date I have been neglected, violated, harassed, and manipulated by staff here in Pontiac.". (Ex. 1 ¶ 72); (Exhibit 23, Aug. 20 Grievance #1, IDOC 000015-000016) (emphasis added.) The Grievance Office responded to this grievance. (*Id.* at 000015.)

65.     On September 2, 2022, Plaintiff filed an "emergency" grievance with the Pontiac Correctional Center's Grievance Office alleging the July 19 Allegations and the July 27 Allegations. (Ex. 1 ¶ 73); (Exhibit 24, Sept. 2 Grievance, IDOC 000013-000014.) On September 14, 2022, the warden's office determined it was not an emergency and returned the grievance to Plaintiff, and a counselor later responded to it. (*Id.* at IDOC 000013.)

66.     On September 7, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center's Grievance Office alleging that on September 4, 2022, Correctional Officer Williams wrote a disciplinary report (a ticket) about Plaintiff which stated that Plaintiff demanded an extra food tray, or else Plaintiff would "put a PREA on him," among other things about that officer. (Ex. 1 ¶ 74); (Exhibit 25, Sept. 7 Grievance, IDOC 000011-000012.) The Grievance Office responded to this grievance. (*Id.* at 000011.)

67.     On September 19, 2022, Plaintiff filed a grievance with the Pontiac Correctional Center's Grievance Office alleging that staff are withholding makeup from Plaintiff in restrictive housing as cruel and unusual punishment. (Ex. 1 ¶ 76); (Exhibit 26, Sept. 19 Grievance, IDOC 000023, 000025-000026.) The Grievance Office responded to this grievance twice. (*Id.* at IDOC 000023, 25.)

68.     On October 5, 2022, Plaintiff transferred out of Pontiac Correctional Center and into Menard Correctional Center. (Ex. 1 ¶ 77); (Ex. 2.)

69.     Correctional Officer Christopher Williams never heard of officers 'spiking' food trays, has never said any such thing to Plaintiff, did not have access to the contents of any grievance box from June 2022 to October 2022, has never heard or seen of a grievance box remaining unlocked, and has never observed any staff member at North Cell House refusing to collect Plaintiff's grievance forms during collection. (Ex. 9 ¶¶ 10, 12, 26-28, 41.)

70.     Correctional Major Travis Bantista has never spoken to nor interacted with Plaintiff at any time, was never responsible for distributing food to inmates

from June 2022 to October 2022, has never heard of incidents where officers would "spike" an inmate's food tray with glass or metal, was never responsible for collecting grievances from inmates from June 2022 to October 2022, never had access to grievance boxes or their contents during the same period, has never observed any staff member at North Cell House refusing to collect Plaintiff's grievance forms during collection, and has never retaliated against a person in custody for filing grievances. (Ex. 8 ¶¶ 5-6, 8-10, 14, 24-25.)

72. Defendant Curtis Bailey, a Correctional Lieutenant, did not collect or review any grievances from June 2022 to October 2022, never had access to any grievance box because they were always locked, has never observed any instances at Pontiac where a person in custody is barred or unable to file a grievance, he was reassigned away from Plaintiff's housing unit after July 29, 2022, and has never observed or heard of any staff member at Pontiac refusing to collect Plaintiff's grievance forms. (Ex. 7 ¶¶ 5-13, 17-18, 24-26); (Exhibit 27, Bailey Ans. to Pl.'s First Set of Interrogs. ¶¶ 3, 5.)

72. Defendant Thomas Dayton, a Correctional Lieutenant, has never been aware of any instance in which a reviewing officer would simply discard a grievance without reviewing its contents or failing to provide an answer, has never had access to the contents of the grievance boxes, and has never heard of grievance boxes being left unlocked. (Ex. 10 ¶¶ 10-11, 16-17.)

73. Defendant James Attig, a retired Correctional Sergeant, never had access to the contents of any grievance box nor keys that would unlock it, observed

inmates handing their grievances directly to counselors during cell house tours, has never heard or seen of an officer or counselor looking at a grievance form and discarding it without reviewing it, and was reassigned to a different part of the prison away from Plaintiff. (Ex. 6 ¶¶ 10, 14, 18, 20); (Exhibit 28, Attig Ans. to Pl.'s First Set of Interrogs. ¶¶ 3, 5.)

74.     Defendant Travis Peters, a retired Correctional Officer, never heard or saw anything about officers "spiking" food trays with metal or glass, never had access to the grievance boxes, never noted them to be accessible without a key, and has never retaliated against any inmate for filing a grievance about him or any other IDOC staff member. (Exhibit 29, Decl. of Peters ¶¶ 7, 10-16.)

## III.     ARGUMENT

### A.     The grievance process was available to Plaintiff.

The undisputed facts demonstrate that a robust and accessible grievance process was readily available to Plaintiff at Pontiac Correctional Center. The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit. 42 U.S.C. § 1997e(a).

First, Pontiac Correctional Center maintains a comprehensive grievance system that is clearly communicated to all inmates. Upon arrival at Pontiac on June 9, 2022, Plaintiff attended inmate orientation and received a copy of the Pontiac Orientation Manual, which contained detailed information on the filing of grievances and the IDOC grievance procedure. (UMF ¶¶ 3-5.) This orientation ensured that Plaintiff was fully informed about the available grievance process. The orientation

manual, which included explanations of and verbatim copies of the Illinois Administrative Code, detailed in plain English how the grievance system works at Pontiac: Inmates can obtain grievance forms from their housing units and submit them through designated lock boxes, with initial grievances to be addressed to the inmate's counselor within 60 days of the incident, except for sexual abuse allegations which have no time limit.

Second, the grievance process at Pontiac is readily accessible to all inmates, including those in restrictive housing or mental health units. Grievance boxes are located throughout the facility, including in each cell house and on each floor of the mental health housing unit. (UMF ¶¶ 17-19). During lockdowns, portable grievance boxes are used to ensure continued access. (UMF ¶ 22). Inmates can obtain grievance forms from any IDOC employee, their cell house counselor, or by writing to the grievance office. (UMF ¶ 32). This multi-faceted approach ensures that the grievance process is not "opaque" or "incapable of use."

Third, the grievance system includes safeguards against interference or intimidation. Grievance boxes are securely locked, and only clinical staff members and clinical supervisors have access to the keys. (UMF ¶¶ 23-24). Inmates may place grievances in the boxes themselves, without staff handling. (UMF ¶¶ 25, 27-28). These measures protect against any potential "machination, misrepresentation, or intimidation" by staff.

Perhaps most tellingly, Plaintiff's own actions demonstrate the availability of the grievance process. Between June and September 2022, Plaintiff successfully filed

numerous grievances on various issues. (UMF ¶¶ 45-50, 56-60, 62-67). This includes grievances filed both before and after the alleged incidents at issue in this lawsuit. Plaintiff's frequent use of the grievance system during this period conclusively shows that it was not a "simple dead end" or practically incapable of use.

In *Woodford v. Ngo*, 548 U.S. 81, 90 (2006), the Supreme Court emphasized that "proper exhaustion" requires complying with an agency's deadlines and other critical procedural rules. The grievance process at Pontiac provided clear procedures and multiple avenues for filing, all of which were available to Plaintiff, and all of which Plaintiff used—but chose not to as to the allegations in this lawsuit. The undisputed facts show that Plaintiff was aware of these procedures and capable of using them.

Given the comprehensive nature of Pontiac's grievance system, the multiple safeguards in place, and Plaintiff's demonstrated ability to use the system, there can be no genuine dispute that the grievance process was available to Plaintiff. Plaintiff's failure to exhaust her administrative remedies for the specific claims in this lawsuit cannot be attributed to any unavailability.

### B. Plaintiff failed to properly exhaust administrative remedies for the July 19, 23, and 27 Allegations.

Despite the clear availability of the grievance process, Plaintiff failed to properly exhaust her administrative remedies for the key allegations in this lawsuit. The PLRA mandates that inmates must exhaust "such administrative remedies as are available" before bringing suit. 42 U.S.C. § 1997e(a). The PLRA demands "proper exhaustion," which means using all steps that the agency holds out, and doing so

properly. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). See also *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (emphasizing that a prisoner must use all steps that the prison holds out and do so "strict[ly complying] with those procedural rules). Rather, Plaintiff was poised to go directly to this Court without properly exhausting first. (UMF ¶¶ 49, 56-58, 61.)

### 1. July 19 Allegations: Improper direct filing with ARB.

Regarding the July 19, 2022 allegations of excessive force, failure to provide medical attention, and IDOC staff's failure to intervene, Plaintiff failed to properly exhaust administrative remedies. On July 22, 2022, Plaintiff improperly filed a grievance directly with the Administrative Review Board (ARB) instead of following the prescribed grievance procedure at Pontiac. (UMF ¶¶ 50-52). The ARB rejected this grievance on July 27, 2022, explicitly instructing Plaintiff to obtain responses from the counselor, grievance officer, and chief administrative officer before appealing to the ARB. (UMF ¶ 52). Despite this clear instruction, Plaintiff did not refile the grievance properly at Pontiac until September 2, 2022, three weeks after commencing this lawsuit. (UMF ¶ 65).

This failure to follow proper procedures does not constitute proper exhaustion. Plaintiff's improper filing with the ARB and subsequent untimely filing at Pontiac after filing this lawsuit both fall short of this standard.

### 2. July 23 Allegations: No grievance filed.

For the alleged sexual abuse incident on July 23, 2022, Plaintiff failed to file any grievance whatsoever. (UMF ¶ 54). This complete failure to engage with the

administrative process is a clear violation of the PLRA's exhaustion requirement. The Supreme Court has consistently held that exhaustion is mandatory under the PLRA, and that courts have no discretion to excuse an inmate's failure to exhaust administrative remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("When it comes to statutory exhaustion provisions, courts have a role in creating exceptions only if Congress wants them to. So mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.")

> **3. July 27 Allegations: Improper direct filing with ARB and failure to follow through with ARB's Direction on re-filing in order to exhaust.**

Regarding the July 27, 2022 allegations, Plaintiff again failed to properly exhaust. On August 4, 2022, Plaintiff improperly filed a grievance directly with the ARB. (UMF ¶ 57). As with the July 19 allegations, the ARB rejected this grievance and instructed Plaintiff to obtain responses from the facility-level administrators first. (*Id.*) Plaintiff did not properly file this grievance at Pontiac until September 2, 2022, again, well after already commencing this lawsuit. (UMF ¶ 65).

It is worth noting that while grievances related to sexual abuse are not subject to internal prison filing deadlines (UMF ¶ 8), Plaintiff's September 2 grievance was still improper because it was filed after the initiation of this lawsuit on August 11, 2022. (UMF ¶¶ 61, 65). The Seventh Circuit has clearly held that "a suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits even if the

prisoner exhausts intraprison remedies before judgment." *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999).

In conclusion, for each of the key incidents underlying this lawsuit, Plaintiff either failed to file a grievance, filed improperly, or filed untimely (meaning, attempting to exhaust *after* filing suit). These actions fall far short of the "proper exhaustion" required by the PLRA and reinforced by Supreme Court and Seventh Circuit precedent. Plaintiff's failure to exhaust administrative remedies as required by the PLRA bars this action and necessitates summary judgment in favor of the Defendants.

### C. No reasonable factfinder could agree with Plaintiff's claims of unavailability.

Plaintiff contends that the grievance process was unavailable to her due to staff interference and intimidation. However, these claims would not be credible to a reasonable factfinder as a matter of law, when viewed in light of the totality of the evidence. As noted above, the Supreme Court in *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016), outlined three scenarios where an administrative remedy might be "unavailable": when it operates as a "simple dead end," when the administrative scheme is so opaque that it becomes incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. The undisputed facts demonstrate that none of these scenarios of unavailability apply here, administrative remedies were "clearly available," and dismissal is required.

First, Plaintiff's own actions in filing numerous grievances during the relevant time period directly contradict her claims of unavailability. Between June and September 2022, Plaintiff successfully filed at least ten grievances on various issues. (UMF ¶¶ 45-50, 56-60, 62-67). These grievances covered a wide range of topics, including allegations of staff misconduct, medical care, and religious accommodations. Plaintiff's ability to file these grievances (and to receive responses to them from facility staff) demonstrates that the process was not a "simple dead end" and was indeed capable of use.

Of particular note is Plaintiff's August 19, 2022 grievance, which explicitly mentioned the July 27 allegations, stating "Srg. Bailey for raping me." (UMF ¶ 62). This grievance, filed well after the alleged incidents and after already filing suit, shows that Plaintiff was able to use the grievance system to report even serious allegations of staff misconduct, directly contradicting her claims of intimidation or interference. No reasonable factfinder would conclude that Pontiac did not possess a grievance system capable of use to Plaintiff.

Second, the sworn declarations of staff members refute Plaintiff's allegations of interference or intimidation. Correctional Officer Williams, Correctional Major Bantista, and Defendants Bailey, Dayton, Attig, and Peters all deny any involvement in obstructing Plaintiff's access to the grievance process. (UMF ¶¶ 69-74). These declarations consistently state that they never refused to collect Plaintiff's grievances, never had improper access to grievance boxes, and never retaliated against inmates for filing grievances. Plaintiff's consistent and frequent use of the

grievance process from June 2022 to October 2022, and these individuals unequivocally explaining the foundation of how the grievance process was available to everyone equally goes to the heart of how no reasonable factfinder would believe that Plaintiff was intimidated from complaining about staff misconduct, even as to serious matters like the July 19, 23, and 27 Allegations.

Third, the physical security measures of the grievance system make Plaintiff's claims of staff interference implausible. Grievance boxes are securely locked, with access limited to clinical staff members and clinical supervisors. (UMF ¶¶ 23-24). Inmates place grievances in the boxes themselves, without staff handling. (UMF ¶¶ 25, 27-28). These measures ensure that correctional officers (like the Defendants, and C/O Christopher Williams and Major Travis Bantista) cannot improperly access or discard grievances, as Plaintiff alleges. Plaintiff has no evidence to support her foundationless allegation that grievance boxes were unlocked or accessible to correctional staff. It is undisputed that correctional staff cannot access those boxes.

Furthermore, Plaintiff's claim that she was "uncomfortable" using "unsecured grievance boxes" (UMF ¶ 40) is directly contradicted by the undisputed fact by individuals with personal knowledge of the grievance processs that all grievance boxes are locked and secure. (UMF ¶¶ 23-24).

These facts alone would be enough to defeat Plaintiff's assertion of unavailability. But even setting aside the evidentiary record, the controlling law makes clear that subjective beliefs or speculative fears—without more—do not excuse the failure to exhaust. The Seventh Circuit has also emphasized that

*unavailability* must be objective, and not subjective. *Twitty v. McCoskey*, 226 F. App'x 594, 596 (7th Cir. 2007) (quoting *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000)).

In this case, the undisputed facts show that the grievance process was not only available but was *regularly used by Plaintiff* to allege serious and unserious allegations about staff. Her claims of subjective unavailability are contradicted by her own actions, the numerous sworn statements of staff, and the grievance process's physical security measures that are in place. Accordingly, there is no genuine issue of material fact regarding the availability of the grievance process. Plaintiff's failure to exhaust cannot be excused.

### D. Fear is not a valid excuse for failure to exhaust under the PLRA.

Plaintiff contends that fear prevented her from properly utilizing the grievance system. However, fear alone is not a recognized excuse for failure to exhaust under the PLRA. While courts have acknowledged that fear can, in rare cases, reflect systemic unavailability, such a claim must be supported by objective evidence showing that the administrative process was rendered incapable of use. That standard is not met here. Plaintiff's own contemporaneous use of the grievance process—often to raise serious allegations against staff—demonstrates that the process remained available and that any claimed fear did not prevent its use.

The Supreme Court in *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), made clear that the PLRA mandates exhaustion of available remedies, irrespective of the forms they might take. The Court outlined circumstances where an administrative remedy

may be unavailable, none of which include an inmate's subjective fear; rather, they are based on objective conditions irrespective of the inmate's state of mind of feelings. Lower courts have consistently applied this principle, rejecting excuses for non-exhaustion based on subjectiveness. E.g., *McDonald v. Henze*, No. 20 C 643, 2022 U.S. Dist. LEXIS 16762, at *10 (N.D. Ill. Jan. 31, 2022) ("subjective beliefs about whether he properly exhausted his grievance play no role in the exhaustion analysis"). Plaintiff's objectively unreasonable (and nonsensical, based on Plaintiff's own record) beliefs about the grievance process do not excuse a failure to exhaust. Either a remedy is available, or it is not, and Plaintiff's own writings establish conclusively that they were available here. *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 998 (6th Cir. 2004).

In the present case, Plaintiff's claim of fear would be unconvincing to a reasonable factfinder given her demonstrated willingness to file grievances on other (and sometimes the same) serious matters during the same time period. Between June and September 2022, Plaintiff filed numerous grievances, including those alleging serious staff misconduct. (UMF ¶¶ 45-50, 56-60, 62-67). Notably, on August 19, 2022, Plaintiff filed a grievance explicitly mentioning "Srg. Bailey for raping me" (UMF ¶ 62), demonstrating her ability to report even astonishing allegations of staff misconduct through the grievance system.

This pattern of grievance-filing directly contradicts Plaintiff's assertion that fear prevented her from utilizing the grievance process for the incidents at issue in this lawsuit. As the Seventh Circuit noted in *Twitty v. McCoskey*, 226 F. App'x 594,

596 (7th Cir. 2007), the PLRA does not excuse exhaustion for prisoners who simply believed the administrative processes were inefficient, meaningless, or futile. Instead, the prisoner must show that the administrative process was, in fact, "incapable of use."

Moreover, allowing subjective fear of retaliation to excuse the exhaustion requirement would undermine the very purposes of the PLRA. As the Supreme Court explained in *Porter v. Nussle*, 534 U.S. 516, 524 (2002), the PLRA was enacted to reduce the quantity and improve the quality of prisoner suits, to filter out meritless claims, and to facilitate better-prepared litigation of claims that do proceed to court. Excusing exhaustion based on an inmate's claimed, inconsistent and objectively unreasonable fears would create a loophole that could swallow the rule, effectively nullifying the PLRA's exhaustion requirement.

It is also worth noting that Pontiac Correctional Center has measures in place to protect the confidentiality and integrity of the grievance process, of which Plaintiff has no personal knowledge to refute. Grievance boxes are securely locked, with limited access away from correctional security staff (UMF ¶¶ 23-24), and inmates are always allowed to place grievances in the boxes themselves without staff handling (UMF ¶¶ 25, 27-28). These measures provide additional safeguards against potential retaliation, further undermining any claim that fear should excuse non-exhaustion.

## IV.     Conclusion

Plaintiff's alleged fears do not render administrative remedies unavailable under the PLRA. Her frequent use of the grievance process during the relevant period—including to report serious allegations—demonstrates that she was fully capable of using the system. The undisputed facts, combined with binding precedent rejecting subjective fear as a valid excuse for non-exhaustion, compel dismissal. Summary judgment should be entered in Defendants' favor, or, if any material facts remain genuinely disputed, the matter should proceed to a limited evidentiary hearing consistent with *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008).

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By:    */Daniel N. Robbin/*
Daniel Noah Robbin
Bar No. 6321386
Assistant Unit Supervisor, Prisoner Litigation
Government Representation Division
Office of the Attorney General
115 S. La Salle St.
Chicago, Illinois 60603
(312) 814-7199
daniel.robbin@ilag.gov