E-FILED
Wednesday, 02 September, 2026 09:50:53 AM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| JOSEPH MURPHY,<br>Plaintiff,<br><br>v.<br><br>CURTIS BAILEY, *et al.*,<br>Defendants. | Case No. 1:22-cv-01266-JEH-RLH |

**Order**

This case is now before the Court on Plaintiff's Motion for a New Trial Pursuant to Federal Rule of Civil Procedure 59(a) (Doc. 158) and Defendants' Motion for Bill of Costs (Doc. 157). For the reasons stated below, the Motions are DENIED.

**I**

Plaintiff Andreya Montrise[1] filed a Second Amended Complaint under 42 U.S.C. § 1983 alleging Defendants Travis Peters, Thomas Dayton, Ivan Perez, Curtis Bailey, and James Attig violated her Eighth Amendment rights on July 19, 2022 and July 27, 2022, while she was incarcerated at Pontiac Correctional Center ("Pontiac"). (Doc. 113).

On July 19, 2022, Plaintiff was transferred from South Mental Health by Defendant Officer Peters and Defendant Lieutenant Dayton. During this transfer, Peters allegedly squeezed Plaintiff's wrist cuffs tightly, causing pain, and both Peters and Dayton ignored Plaintiff's distress. Plaintiff was also cuffed behind the back and at the ankles. Dayton pushed Plaintiff forward, causing Plaintiff to fall

[1] Plaintiff is a transgender woman who uses she/her pronouns. (Doc. 113 at ¶¶ 10-11). Plaintiff is known to the Illinois Department of Corrections as Joseph Murphy. *Id.* at p. 1.

on her face. Peters then placed his knee on Plaintiff's back, causing further pain, and both Peters and Dayton dragged Plaintiff through the prison, periodically slamming Plaintiff down, resulting in injuries to the wrist, ankle, lower calves, shoulders, and back.

Plaintiff was subsequently dragged into North Cell House 1 Gallery Holding Tank 2. Plaintiff was lying face down on the floor and was not resisting. Defendant Sergeant Perez grabbed the back of Plaintiff's head and slammed it down into the floor, then exerted pressure on the back of Plaintiff's head, and smashed Plaintiff's face into the floor. Peters and Dayton then left Plaintiff with Perez. Plaintiff asked Perez for medical attention, but he refused.

On July 27, 2022, Plaintiff, who was feeling mentally unstable, requested a crisis team. Plaintiff was placed in Holding Tank 01, where Nurse Kendra conducted a mental health assessment. Plaintiff claimed she was not suicidal or homicidal, but Defendant Sergeant Bailey forced Plaintiff to go on crisis watch. Bailey and Defendant Sergeant Attig then took Plaintiff out of Holding Tank 01 and placed her in a room in Holding Tank 04, where Plaintiff alleges Bailey forced her to perform oral sex. Attig was present but did not intervene. Plaintiff was then placed on crisis watch and had suicidal thoughts due to the assault. Plaintiff reported the sexual abuse, leading to an investigation involving Nurse Kendra, Internal Affairs Officers, and the Illinois State Police.

Based upon these facts, Count I alleged the use of excessive force by Defendants Peters, Dayton, and Perez on July 19, 2022 and Defendant Bailey on July 27, 2022; Count II alleged Defendants Peters and Dayton failed to intervene to stop the use of excessive force on July 19, 2022, and Defendant Attig failed to intervene to stop the sexual assault on July 27, 2022; and Count III alleged Defendant Perez was deliberately indifferent to Plaintiff's serious medical needs by denying medical attention on July 19, 2022.

On March 30, 2026, this case proceeded to a jury trial due to disputed issues of material fact. On April 2, 2026, the jury returned a verdict for Defendants. (Doc. 154).

On April 20, 2026, Defendants filed a Motion for Bill of Costs. (Doc. 157). On May 7, 2026, Plaintiff filed a Response. (Doc. 159).

On May 4, 2026, Plaintiff filed a Motion for a New Trial. (Doc. 158). On May 18, 2026, Defendants filed a Response. (Doc. 162). On June 1, 2026, Plaintiff filed a Reply. (Doc. 167).

**II**

Plaintiff filed a Motion for a New Trial under Rule 59(a) arguing the Court should order a new trial because defense counsels' misconduct prevented Plaintiff from fully and fairly presenting her case and affected the jury's ability to evaluate a central contested issue—the absence of surveillance camera footage of the incident on July 19, 2022.

**A**

Federal Rule of Civil Procedure 59(a) provides that "the court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a). "[A] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (citation omitted). The court "will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). "Accordingly, the standard to grant a new trial is high, and a court must only grant a Rule 59 motion when 'the record shows that the jury's verdict resulted

in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Wrice v. Byrne*, 488 F. Supp. 3d 646, 653 (N.D. Ill. 2020) (quoting *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012)).

**B**

During discovery in this matter, Defendants produced surveillance camera footage from July 27 but did not produce footage from July 19. The absence of footage from July 19 was a contested issue throughout this case and at trial. During a break in closing arguments on April 1, 2026, Plaintiff's counsel claims she learned from Plaintiff for the first time that some of the events on July 19 and July 27 occurred in the same areas at Pontiac, including a holding tank and certain hallways and stairwells in North Cell House. (Doc. 158-1 at ¶ 4). Plaintiff contends that defense counsel created a "false narrative" that there were no surveillance cameras or the cameras were inoperable on July 19. (Doc. 158 at p. 2). Plaintiff asserts defense counsels' "misconduct" at trial included four acts, "each designed to hide the fact that functioning cameras recorded the July 19 events." *Id.* at p. 4. These four "acts" are discussed below.

**1**

First, Plaintiff argues that during Defendant Peters' direct examination, defense counsel attempted to offer a video from July 27 (PTX-25), which apparently showed the same holding tank and hallway Plaintiff was dragged through on July 19. Plaintiff objected. At a sidebar, the Court asked, "It's not the room that's involved in the incident [s]he was in?" (Doc. 158 at p. 4) (citing Mar. 31 Tr. at 126:1-4; 9-10)). Plaintiff's counsel stated, "I'm under the impression that is not the holding tank that was involved at all in the July 19th incident. That was the July 27th video." *Id.* Defense counsel then stated: "It's just for the layout of where a holding tank in which Plaintiff was placed was in the general vicinity of that room to describe what that area was comprised of." (Doc. 158 at pp. 4-5) (citing

Mar. 31 Tr. at 126:5-8)). The Court ultimately sustained Plaintiff's objection, finding that footage related to a different incident would confuse the jury. (Doc. 158 at p. 5) (citing Mar. 31 Tr. at 127:8-11)).

Plaintiff argues defense counsel had an opportunity to clarify the confusion regarding where the incidents occurred during the sidebar but chose not to. (Doc. 158 at p. 5). As Defendants note in their Response, Plaintiff's counsel did not ask any follow-up questions or ask the Court for further inquiry into the relationship between the two locations during the sidebar.

There is no evidence in the record that defense counsel concealed the location of the incidents or suggested that the two locations were geographically unrelated. Plaintiff knew where both incidents occurred. The fact that Plaintiff's counsel claims she did not know about the geographic overlap until Plaintiff told her during a break in closing arguments does not warrant a new trial.

**2**

Second, Plaintiff argues that during Defendant Peters' cross-examination, defense counsel asked Peters whether the cameras at Pontiac were "all operative" and established that Peters had no access to the servers or the ability to view footage himself. *Id.* (citing Mar. 31 Tr. at 141:12-25). Plaintiff argues this line of questioning caused the jury to infer that camera coverage on July 19 was uncertain.

**3**

Third, Plaintiff argues defense counsel elicited testimony from Lieutenant William Shevlin about Pontiac's camera systems, even though Mr. Shevlin had never worked at Pontiac and had no surveillance responsibilities. Defense counsel asked whether Mr. Shevlin had knowledge of Pontiac's camera systems, whether he knew if the cameras were operational in July 2022, whether he understood how far apart cameras were in Pontiac's hallways, and whether he knew if "there are even any cameras underneath the dome bubbles that are in the hallways at

Pontiac." (Doc. 158 at p. 6) (citing Mar. 31 Tr. at 201:11-24)). In response to each of these questions, Mr. Shevlin answered, "No, sir." *Id.* Plaintiff argues this line of questioning created a false impression for the jury that the cameras did not work or there were no cameras at all, even though the very same cameras captured footage on July 27.

Defendants argue there is no evidence in the trial record that any witness had personal knowledge of video surveillance technologies at Pontiac, including Mr. Shevlin, who was Plaintiff's witness in her case-in-chief. There is also no evidence that any witness had knowledge of the existence of a video from July 19. Defendants argue that witnesses were questioned about their personal awareness of video surveillance technologies to show (1) that there was no direct evidence Defendants were responsible for the "missing" or "unproduced" video, and (2) that no witnesses, including Mr. Shevlin, had personal knowledge of those surveillance technologies.

As Defendants state in their Response, Plaintiff did not lodge any objections to the video-operability questions. "By failing to object, Plaintiff[] may not raise the issue for the first time in a motion for a new trial or on appeal." *Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012) (citing *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("When a [party] does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal.")). Although Plaintiff argues in her Reply that these problems were only apparent to counsel *after* the close of evidence, Plaintiff could have objected based upon speculation or when the issues purportedly became apparent during closing arguments. (Doc. 167 at p. 1).

The fact that Plaintiff's counsel may have posed different questions during Defendant Peters' and Mr. Shevlin's examinations if she had realized both incidents occurred in overlapping locations does not warrant a new trial. There is

no evidence that defense counsel orchestrated a "false narrative" about cameras or video footage or intentionally misled Plaintiff's counsel about where the incidents occurred.

**4**

Fourth, Plaintiff argues that before closing arguments, defense counsel "secured a limiting instruction" that Plaintiff's counsel "may not . . . imply or infer that these defendants are in any way responsible for the fact that there is no video." (Doc. 158 at p. 6) (citing Apr. 1 Tr. at 150:11-14)). Plaintiff argues this instruction amplified the prior misconduct and ensured the "misleading impression" created by Defendant Peters' and Mr. Shevlin's examinations would reach the jury unrebutted. (Doc. 158 at p. 6).

Defendants did not secure a limiting instruction. Rather, the Court *sua sponte* admonished Plaintiff's counsel prior to closing arguments, outside the presence of the jury, by stating:

> . . . I've allowed testimony about cameras and whether there is footage, and to the extent that evidence has been introduced as to the existence of cameras and whether there is or is not footage, that's certainly something that can be addressed in closing argument. Okay? But you may not, you know, imply or infer that these defendants are in any way responsible for the fact that there is no video because there's no evidence to show that. In fact, all the evidence is to the contrary.

(Doc. 162 at p. 27) (citing Apr. 1 Tr. at 150:6-16)).

**C**

Plaintiff argues the cumulative effect of defense counsels' misconduct merits a new trial. "To prevail on [her] cumulative effect argument, Plaintiff[] must show: '(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [her] trial fundamentally unfair.'" *Christmas*, 682 F.3d at 643 (quoting *United States v. Powell*, 652 F.3d 702,

706 (7th Cir. 2011)). In support of her arguments, Plaintiff relies on *Walden*, *Kiefel*, *Adams,* and *Caudle*. Each case is distinguishable.

In *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163 (7th Cir. 1968), counsel cross-examined witnesses about an exhibit "never offered in evidence" and introduced statements "under the pretext of laying a foundation" for impeachment. *Id.* at 1165. The court found counsel's conduct was "a deliberate misuse of the judicial process." *Id.* at 1168. Plaintiff argues that "[d]efense counsel's use of Shevlin—a witness known to be ignorant of Pontiac's surveillance systems—to elicit 'No, sir' answers that functioned as testimony about the non-existence of cameras is that same deliberate misuse." (Doc. 158 at p. 9). Mr. Shevlin was Plaintiff's witness in her case-in-chief. Defense counsel's cross-examination of Mr. Shevlin was largely limited to Mr. Shevlin's lack of knowledge about Pontiac. This is far from a deliberate misuse of the judicial process.

In *Adams Laboratories, Inc. v. Jacobs Engineering Co.*, 761 F.2d 1218 (7th Cir. 1985), counsel placed plaintiff's bankruptcy and wealth comparisons before the jury in opening statements, biasing its view "from the outset" of trial despite the court ordering *in limine* that counsel could not do so. *Id.* at 1224-26. Here, there is no evidence that Defendants placed false or irrelevant facts before the jury. Defense counsel asked witnesses what they personally knew about Pontiac's surveillance systems and established that Defendants had no personal involvement in or knowledge of the operation of those systems. Defendants did not violate a court order like counsel in *Adams* did.

In *Walden v. City of Chicago,* 846 F. Supp. 2d 963 (N.D. Ill. 2012), the court granted a new trial after concluding that "sustained objections, admonishing of counsel, and jury instructions" had been insufficient to cure prejudice from repeated misconduct that reoccurred during the trial. *Id.* at 980. In *Walden*, the trial record revealed that the aggrieved party objected repeatedly, and the curative

measures proved inadequate because of the repeated misconduct. Here, Plaintiff did not object at trial to the issues she now raises in her Motion.

In *Caudle v. District of Columbia*, 707 F.3d 354 (D.C. Cir. 2013), counsel continued to engage in the same type of misconduct after three successive objections were sustained. *Id.* at 363. The *Caudle* court emphasized that the case was "not . . . one in which counsel made a single misstatement and ceased further misstatements after the district court sustained an objection." *Id*. at 363. Plaintiff argues that the "misconduct" during Defendant Peters' examination occurred after the Court sustained the objection to the introduction of the July 27 video (PTX-25), followed by additional "misconduct" during Mr. Shevlin's cross-examination. (Doc. 158 at p. 9). *Caudle* is not on point. The sidebar addressed whether defense counsel could use the July 27 video to demonstrate what an area looked like during the July 19 incident. The Court sustained Plaintiff's objection based on Federal Rule of Evidence 403, finding that the video would confuse the jury. The questions defense counsel posed to Defendant Peters and Mr. Shevlin related to what they personally knew about Pontiac's surveillance systems, not the July 27 video discussed at the sidebar. Having reviewed the record and defense counsels' alleged conduct with respect to its cumulative effect upon the jurors, the Court finds that the conduct did not deprive Plaintiff of a fair trial.

**D**

Finally, Defendants argue Plaintiff waived any objection to purported "misconduct" and a "false narrative" by failing to object at trial. (Doc. 162 at p. 23).

To preserve an issue as the basis for a new trial, the moving party must have timely objected or brought the issue to the trial court's attention for a ruling. *Christmas*, 682 F.3d at 640 ("By failing to object, Plaintiffs may not raise the issue for the first time in a motion for a new trial or on appeal."); *see also Chestnut v. Hall*, 284 F.3d 816, 819 (7th Cir. 2002) (specific objections required so "district courts

[have] the opportunity to amend erroneous jury instructions, thereby avoiding the need for further review and potential retrial").

While Plaintiff argues counsel was unable to make contemporaneous objections during the trial because the "misconduct was not apparent in real time," Plaintiff does not explain why she failed to object or bring this issue to the Court's attention after purportedly learning that the two incidents occurred in the same locations during a break in closing arguments. (Doc. 167 at p. 6). The record reflects that a "break during closing arguments" occurred only once, immediately after Ms. Parsons delivered her closing argument. The jury returned after that recess for Mr. Robbin's closing argument. After Mr. Robbin's closing argument, Ms. Parsons promptly delivered her rebuttal, and the case was submitted to the jury for deliberation. (Doc. 162 at p. 25) (citing Apr. 1 Tr. at 185:25-203:17)). Plaintiff's counsel's failure to object when she learned of the purported "misconduct" is fatal to her Motion.

The Court finds that Plaintiff was not deprived of a fair trial, and Plaintiff waived the issue by not objecting during trial. Plaintiff's Motion for a New Trial is DENIED.

**III**

Following trial, Defendants filed a Motion for Bill of Costs pursuant to Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920(2) seeking $8,834.10 in costs for transcripts from depositions and hearings. (Doc. 157). "Fees for printed or electronically recorded transcripts necessarily obtained for use in the case" are recoverable under § 1920(2).

Defendants seek $6,044.25 for depositions, including $803.70 for James Attig's deposition (Doc. 157-3); $781.90 for Travis Bantista's deposition (Doc. 157-4); $414.10 for Anthony Leslie's deposition (Doc. 157-5); $297.15 for Curtis Bailey's deposition (Doc. 157-6); $808.45 for Enrique Ruiz's deposition (Doc. 157-7); $671.90

for Thomas Dayton's deposition (Doc. 157-8); $754.60 for Christopher Williams' deposition (Doc. 157-9); $766.75 for Jessica Tunget's deposition (Doc. 157-13); and $745.70 for Joshua Meredith's deposition (Doc. 157-14). Six of Defendants' deposition invoices (Docs. 157-3—157-8) present only a lump sum "Transcript Services" figure with no itemization, such as page count, per page rate, or other fees.

Defendants also seek $2,789.85 for transcripts from hearings and the trial, including $267.50 for a transcript from a motions hearing on August 5, 2024 (Doc. 157-2); $28.60 for a transcript of an oral argument on July 21, 2025 (Doc. 157-10); $514.80 for a transcript of the final pretrial conference on November 3, 2025 (Doc. 157-11); $292.00 for a transcript of a status conference on November 24, 2025 (Doc. 157-12); and $1,686.95 for a rough draft copy of transcripts from the trial on March 30, 2026, March 31, 3026, and April 1, 2026 (Doc. 157-15).

Plaintiff filed a Response arguing her indigency warrants denial or reduction of any costs award. Plaintiff also asserts costs should be denied because this case was brought in good faith, and the issues were close and difficult. Finally, Plaintiff argues the Court should not award costs for depositions Plaintiff took to address Defendants' exhaustion defense, which the Court rejected. (Doc. 159).

**A**

Under Federal Rule of Civil Procedure 54(d), the prevailing party is entitled to costs. FED. R. CIV. P. 54(d). "[A] cost must be both reasonable and necessary to the litigation for a prevailing party to recover it." *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008). The determination of whether to tax costs against the losing party requires two inquiries: "(1) whether the cost imposed on the losing party is recoverable and (2) if so, whether the amount assessed for that item was reasonable." *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000).

Although there is a strong presumption that the prevailing party will recover costs, *Park v. City of Chicago*, 297 F.3d 606, 617 (7th Cir. 2002), the "party seeking an award of costs carries the burden of showing that the requested costs were necessarily incurred and reasonable." *Trs. of the Chicago Plastering Inst. Pension Tr. v. Cork Plastering Co.*, 570 F.3d 890, 906 (7th Cir. 2009). Once the prevailing party demonstrates that costs should be allowed, the losing party then bears the burden to affirmatively show the taxed costs are inappropriate. *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005). Generally, only the losing party's inability to pay or misconduct by the prevailing party worthy of penalty will suffice to justify denying costs. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997). Ultimately, the decision of whether to award costs is within the district court's discretion. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991).

A party's indigence (based on *in forma pauperis* status), "does not automatically excuse the losing party from paying the prevailing party's costs." *Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006). The statute dealing with *in forma pauperis* status, 28 U.S.C. § 1915, expressly provides for awarding "costs at the conclusion of the suit or action as in other cases." *McGill v. Faulkner*, 18 F.3d 456, 459 (7th Cir. 1994). The indigence "exception is a narrow one. Rule 54(d)(1) provides a presumption that costs are awarded to the prevailing party, and the burden is on the non-prevailing party to overcome this presumption." *Rivera*, 469 F.3d at 636.

When ruling on a party's assertion that she is indigent and therefore unable to pay costs, the Court must conduct a two-step analysis. First, the Court must "make the threshold factual finding that the losing party is 'incapable of paying the court-imposed costs at this time or in the future.'" *Id.* at 635 (quoting *McGill v. Faulkner*, 18 F. 3d 456, 459 (7th Cir. 1994)). The losing party bears the burden of

providing the court with "sufficient documentation to support such a finding." *Rivera*, 469 F.3d at 635 (quoting *Chapman v. AI Transp.*, 229 F. 3d 1012, 1039 (11th Cir. 2000)). Second, the Court should "consider the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised by a case when using its discretion to deny costs." *Rivera*, 469 F.3d at 635. "No one factor is determinative, but the district court should provide an explanation for its decision to award or deny costs." *Rivera*, 469 F.3d at 635-36.

**B**

Defendants argue Plaintiff is not indigent because she is incarcerated and has no living expenses. Defendants also assert Plaintiff filed another action through retained counsel in the Southern District of Illinois (Case No. 25-cv-109) on January 24, 2025, and paid the $405.00 filing fee. Finally, Defendants claim Plaintiff received at least $3,497.40 in income since April 27, 2021. Defendants did not explain how they determined how much income Plaintiff received or attach any supporting documentation.

Plaintiff argues she is indigent and unable to pay $8,834.10 in costs now or in the foreseeable future. Plaintiff is incarcerated at Pontiac Correctional Center. ILL. DEP'T OF CORR., INDIVIDUAL IN CUSTODY SEARCH, https://idoc.illinois.gov/offender/inmatesearch.html (last visited Aug. 24, 2026). Her expected parole date is October 31, 2031. *Id.* Plaintiff's prison trust fund ledger from August 11, 2022, reflects de minimis income. (Doc. 4). Plaintiff also argues "her prospects upon release do not portend a meaningful ability to satisfy an $8,834.10 judgment in any near-term period." (Doc. 159 at p. 2).

Regarding Plaintiff's ability to pay costs, Plaintiff was permitted to proceed *in forma pauperis* in this matter. (d/e 8/24/2022). Although she paid the filing fee in Southern District of Illinois Case No. 25-cv-109, paying a mandatory filing fee of $405.00 is far less than paying $8,834.10 in costs. While Defendants argue

Plaintiff earned at least $3,497.40 in income since April 27, 2021, Plaintiff's "income" is approximately $58.29 per month[2] and falls far short of $8,834.10 in costs. Although Plaintiff has fewer demands on her income because the prison provides food, clothing, shelter, and medical care, it would still take Plaintiff approximately 151 months, or about 12 years, to pay Defendants' costs.[3] The Court finds that Plaintiff is incapable of paying the requested costs at this time or in the future.

**C**

Next, the Court will consider "the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised." *Rivera*, 469 F.3d at 635. This case involved several Eighth Amendment claims against multiple Defendants. Due to disputes of material fact, Plaintiff's case proceeded to trial on March 30, 2026, which lasted four days. The jury heard evidence regarding the alleged events on July 19 and July 27, 2022, and deliberated for over three hours before returning a verdict. (d/e 151, 152).

Defendants did not address the closeness or difficulty of the issues in this case in their Motion for Bill of Costs. In her Response, Plaintiff argues her Eighth Amendment claims alleging unconstitutional use of force and sexual assault at a state correctional facility were based on a factual record with genuine disputes. Plaintiff argues the jury could have resolved the credibility questions either way. Additionally, Plaintiff argues the jury was deprived of the opportunity to review surveillance footage from July 19, 2022. Under these circumstances, Plaintiff argues it would be especially inappropriate to impose costs.

---

[2] $3,497.40 / 60 months (April 27, 2021 – April 20, 2026 when Defendants' Motion for Bills of Costs was filed) = $58.29 in monthly income

[3] $8,834.10 in costs / $58.29 in monthly income = 151.55 months / 12 = 12.62 years

Although the jury returned a verdict for Defendants, the Court finds that the issues presented in this case were close and difficult. The jury could have resolved the questions of credibility either way. Shifting costs to Plaintiff, who is indigent, would be inappropriate. Defendants' Motion for Bills of Costs is DENIED.

**IT IS THEREFORE ORDERED:**

1) Defendants' Motion for Bill of Costs [157] and Plaintiff's Motion for a New Trial Pursuant to Federal Rule of Civil Procedure 59(a) [158] are DENIED.

*It is so ordered.*

Entered: September 2, 2026

s/Jonathan E. Hawley
U.S. District Judge